### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF MAJD KAMALMAZ            )<br>                                                            )<br>HASSNAA KAMALMAZ                    )<br>                                                            )<br>MARYAM KAMALMAZ                    )<br>                                                            )<br>IBRAHIM KAMALMAZ                     )<br>                                                            )<br>KHALID KAMALMAZ                        )<br>                                                            )<br>ULA KAMALMAZ, and                      )<br>                                                            )<br>SAMAR HAMWI                              )<br>                                                            )<br>         Plaintiffs,                                   )<br>                                                            )<br>         v.                                                )<br>                                                            )<br>THE SYRIAN ARAB REPUBLIC       )<br>c/o Foreign Minister Faisal al-Mekdad )<br>Ministry of Foreign Affairs                 )<br>Next to al-Assad University Hospital  )<br>Next to Presidency of the Council of  )<br>Minister Building                               )<br>Kafar Sousa, Damascus, Syria           )<br>                                                            )<br>         Defendant.                                )<br>_____) | Civil Action No.: 24-cv-2136 |

## **COMPLAINT**

Plaintiffs the Estate of Majd Kamalmaz, Hassnaa Kamalmaz, Maryam Kamalmaz, Ula Kamalmaz, Khalid Kamalmaz, Ibrahim Kamalmaz, and Samar Hamwi (collectively, "Plaintiffs" or "Kamalmaz Family") bring this action against Defendant the Syrian Arab Republic ("Syria" or the "Syrian regime") and alleges as follows:

**INTRODUCTION**

1. Majd Kamalmaz was a U.S. citizen who was abducted, imprisoned, tortured, and killed by the Syrian regime. He was a psychologist whose life's work involved treating patients who suffered severe psychological trauma. He founded a clinic in Lebanon to treat Syrian refugees and planned to establish a clinic in Syria to treat those suffering as a result of the protracted war in that country. He was also a loving father, husband, and brother.

2. Mr. Kamalmaz was abducted at a Syrian regime checkpoint in a suburb of Damascus in February 2017, less than a day after he entered the country. For years thereafter, Mr. Kamalmaz was unlawfully detained, falsely imprisoned, and subject to inhuman and unlawful treatment in notorious Syrian prisons, including the Mezzeh Military Airport.

3. For the past seven years, the members of the Kamalmaz Family have tirelessly pursued every possible lead to advocate for the release of Mr. Kamalmaz. The Kamalmaz Family put their lives on hold since his abduction and have had countless meetings and communications with U.S. government officials, non-government organizations, advocacy groups, and potential witnesses. This took a monumental toll on the Kamalmaz Family's financial resources and mental health.

4. In May 2024, U.S. officials confirmed that Mr. Kamalmaz was killed by the Syrian regime. The disappointment, sadness, and grief the Kamalmaz Family experienced because of that confirmation is indescribable. Until then, the Kamalmaz Family believed that there was a chance they would be reunited with Mr. Kamalmaz. Now, only the prospect of justice remains.

5. Plaintiffs bring this action under the Foreign Sovereign Immunities Act's "state sponsor of terrorism" exception to immunity, 28 U.S.C. § 1605A, and seek compensatory damages

for wrongful death, assault and battery, intentional infliction of emotional distress, and false imprisonment caused by Syria's acts. Plaintiffs also seek punitive damages.

## PARTIES

6.     Majd Kamalmaz was a U.S. citizen who lived in Texas. At the time of his abduction in Syria, he was living temporarily in Lebanon.

7.     Hassnaa Kamalmaz is the sixty-one-year-old widow of Majd Kamalmaz and a U.S. citizen. She was married to Mr. Kamalmaz since 1982. She resides in Texas. She brings this action on her own behalf and as the personal representative of Plaintiff the Estate of Majd Kamalmaz, and as legal heir and beneficiary of the Estate of Majd Kamalmaz.

8.     Maryam Kamalmaz is the thirty-eight-year-old daughter of Majd Kamalmaz. She is a U.S. citizen who resides in Texas. She brings this action on her own behalf as legal heir and beneficiary of the Estate of Majd Kamalmaz.

9.     Ibrahim Kamalmaz is the thirty-five-year-old son of Majd Kamalmaz. He is a U.S. citizen who resides in the United Arab Emirates. He brings this action on his own behalf as legal heir and beneficiary of the Estate of Majd Kamalmaz.

10.     Khalid Kamalmaz is the thirty-seven-year-old son of Majd Kamalmaz. He is a U.S. citizen who resides in Indiana. He brings this action on his own behalf as legal heir and beneficiary of the Estate of Majd Kamalmaz.

11.     Ula Kamalmaz is the forty-one-year-old daughter of Majd Kamalmaz. She is a U.S. citizen who resides in Texas. She brings this action on her own behalf as legal heir and beneficiary of the Estate of Majd Kamalmaz.

12.     Samar Hamwi is the sixty-two-year-old sister of Majd Kamalmaz. She is a U.S. citizen who resides in Virginia. She brings this action on her own behalf.

13. According to the U.S. State Department, the Syria Arab Republic is a state sponsor of terrorism. Syria has been designated as such by the U.S. government since December 29, 1979. *See* Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33,955, 33,956 (May 21, 1980) (codified 15 C.F.R. part 385); *State Sponsors of Terrorism*, U.S. Dep't of State Bureau of Counterterrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited June 6, 2024); *Sotloff v. Syrian Arab Republic*, No. 16-725 (TJK), 2021 U.S. Dist. LEXIS 47625, at *19 (D.D.C. Mar. 15, 2021) ("The State Department designated Syria a state sponsor of terrorism on December 29, 1979, and Syria has remained so designated since."); *see also* Anti-terrorism: Syria, 15 C.F.R. § 742.9(a)(2) (2013) ("The Secretary of State has designated Syria as a country whose government has repeatedly provided support for acts of international terrorism.").

## JURIDICTION AND VENUE

14. This Court has subject matter jurisdiction over Plaintiffs' claims and personal jurisdiction over Defendant the Syrian Arab Republic pursuant to 28 U.S.C. §§ 1330 and 1605A, which provide for jurisdiction over all civil actions for personal injury of a national of the United States caused by acts of torture carried out by state sponsors of terrorism and their officials, employees, and agents.

15. Plaintiffs have afforded the Syrian Arab Republic a reasonable opportunity to arbitrate the claims in this action as required under 28 U.S.C. § 1605A(a). Plaintiffs have made an offer to arbitrate in accordance with accepted international rules of arbitration contemporaneous with this Complaint.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(f)(4).

**FACTUAL ALLEGATIONS**

17. Majd Kamalmaz was born in Syria and immigrated to the U.S. as a young boy with his parents. He became a U.S. citizen in October 1982. He was a U.S. citizen for of the vast majority of his life.

18. He held degrees in psychology from the University of Arkansas (BA) and Florida State University (MS).

19. Mr. Kamalmaz dedicated his career to counseling and helping people suffering from intense psychological trauma stemming from natural and manmade disasters. He treated people in Louisiana after Hurricane Katrina, in Indonesia after the 2004 tsunami, and in Kosovo and Bosnia following the catastrophic wars in those countries.

20. In 2011, the Syrian Civil War began. It is a brutal ongoing multi-sided conflict involving the Syrian Arab Republic, led by the repressive and totalitarian regime of President Bashar al-Assad.

21. After the outbreak of the Syrian Civil War, Mr. Kamalmaz established a clinic in Lebanon to treat traumatized Syrian refugees. Services were provided at no cost and Mr. Kamalmaz provided his services pro bono.

22. In February 2017, Mr. Kamalmaz decided to visit an elderly family member in Damascus, Syria. During this trip, he intended to establish a clinic in Syria to aid victims of war traumatized by the conflict.

23. According to a colleague in Lebanon, Mr. Kamalmaz carefully arranged his trip prior to entering Syria. He used in-country contacts to check whether it would be safe for him to travel to Syria, and he arranged for a driver.

24. Mr. Kamalmaz crossed the border and headed to see his family in Damascus. He called his wife, Plaintiff Hassnaa Kamalmaz, when he arrived and let her know he was safe. He said he would call her back, but he never did.

25. Less than twenty-four-hours after his arrival Mr. Kamalmaz was stopped at a Syrian military checkpoint, in Mezzeh, a suburb of Damascus. He was separated from his driver and then abducted by Syrian soldiers and imprisoned by the Syrian regime.

26. Because of his abduction Mr. Kamalmaz missed a meeting with a colleague. The colleague called Plaintiff Hassnaa Kamalmaz to ask where Mr. Kamalmaz was. Ms. Kamalmaz had no idea and started to panic.

27. Mr. Kamalmaz's abduction is just one example of the Syrian regime's strategy of terror. The State Department has explained that "forced disappearance is . . . used by government security forces on a massive scale to spread fear, stifle dissent, and as punishment." *Syria International Travel Information* at *Safety and Security* subsection, U.S. Dep't of State Bureau of Consular Affairs (July 13, 2023), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SyrianArabRepublic.html.

28. U.S. citizens are often targeted because "[e]lements within the regime as well as non-state actor groups maintain anti-U.S. or anti-Western sentiment." *Id.* Even today, "[t]here is an ongoing, high risk of kidnapping or hostage taking of U.S. citizens and other foreign nationals throughout the country," and "U.S. citizens remain a specific target, with several high-profile abductions having occurred since mid-2012." *Id.*

29. After learning of Mr. Kamalmaz's abduction, the Kamalmaz Family began a multi-year effort to find him and bring him home. On February 16, 2017, the Kamalmaz Family

6

contacted the U.S. Embassy in Beirut, the U.S. State Department, and the United Nations. They also reached out to friends and family in Syria to locate Mr. Kamalmaz and seek his release.

30. The U.S. Federal Bureau of Investigation issued a missing person's alert worldwide seeking more information. That alert is consistent with the allegations here. *See* FBI, Kidnappings/Missing Persons: Majd Kamalmaz Missing Persons Poster, https://www.fbi.gov/wanted/kidnap/majd-kamalmaz (last visited July 12, 2024).



## MAJD KAMALMAZ

February 15, 2017
Mezzeh, Syria

   

### DESCRIPTION

| | |
|---|---|
| Date(s) of Birth Used: January 6, 1958 | Place of Birth: Syria |
| Hair: Gray | Eyes: Brown |
| Height: 5'8" | Sex: Male |
| Occupation: Psychologist | Citizenship: Syrian and American |

### REMARKS

Kamalmaz is diabetic and requires regular medication. He has ties to Mezzeh, Syria.

### DETAILS

Majd Kamalmaz is a psychologist who was treating refugees in the region from war-torn Syria. In February of 2017, he traveled to Syria to visit an elderly family member in Damascus. During this trip, he was also looking to establish a clinic to aid those who have been traumatized by the Syrian civil war. A day after arriving, Kamalmaz was stopped at a Syrian Government checkpoint in Mezzeh, a suburb of Damascus, and has not been seen or heard from since that day.

If you have any information concerning this person, please contact your local FBI office or the nearest American Embassy or Consulate.

Field Office: Washington D.C.

31. Soon thereafter, the Kamalmaz Family learned that Mr. Kamalmaz had been brought to a prison at the Mezzeh Military Airport, which is known for the torture and murder of perceived enemies of the Syrian regime.

32. The prison at Mezzeh Military Airport is run by the Syrian Air Force Intelligence Directorate ("Syrian Air Force Intelligence"), one of Syria's four main intelligence agencies. It is responsible for monitoring and abducting foreign nationals who enter Syria from Lebanon and other countries, and it is known as the "right hand to the al-Assad family."

33. Upon information and belief, the Syrian Air Force Intelligence received word that Mr. Kamalmaz would enter Syria so it was waiting for him. They set up a temporary checkpoint in order kidnap him. Syrian Air Force Intelligence has deployed similar tactics to kidnap other foreign nationals.

34. Major General Jamil Hassan, the head of Syrian Air Force Intelligence was one of the first individuals sanctioned by the United States for human rights abuses following the outbreak of the Syrian Civil War. *See* Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Syrian, Iranian Security Forces for Involvement in Syrian Crackdown*, (June 29, 2011), https://home.treasury.gov/news/press-releases/tg1224.

35. In June 2018, Germany's Federal Court of Justice issued an arrest warrant against Jamil Hassan for killing, persecution, torture and sexual violence at five Syrian Air Force Intelligence facilities, including the Mezzeh Military Airport. European Center For Constitutional and Human Rights (ECCHR), *German authorities issue arrest warrant against Jamil Hassan, head of the Syrian Air Force Intelligence*: *Syria's Air Force Intelligence – Right hand to Assad*, https://www.ecchr.eu/en/case/german-authorities-issue-arrest-warrant-against-jamil-hassan-head-of-the-syrian-air-force-intelligence/ (last visited July 12, 2024).

36. According to a former senior Syrian military official who worked at the Mezzeh Military Airport, and has knowledge of other Syrian Intelligence facilities, it is the most horrific prison facility in all of Syria.

37. According to the same official, people are kept naked or in their underwear, regardless of temperature. A cramped five by six-meter cell holds forty (40) or fifty (50) individual detainees. There is no light, ventilation, or even basic sanitation. Detainees get one bathroom trip a day and they are beaten on the way there and back. The food is meagre and insubstantial. Disease and sickness flourish. Detainees die in scores and these inhumane conditions amount to torture.

38. According to the same official, detainees held at the jail in the Mezzeh Military Airport are subject to additional physical torture. Victims are stripped, blindfolded, and restrained with their hands behind their backs. Then they are brought to an "interrogation" room. In an initial session, the interrogators mercilessly beat the detainee, normally until they lose consciousness. Many detainees die while being subjected to torture.

39. According to the same official, so many victims tortured at the prison at the Mezzeh Military Airport die that Syrian Air Force Intelligence has trouble disposing of all the bodies. Victims are dumped on the side of a road near the prison, and some are dumped into mass graves.

40. For years the Kamalmaz Family worked full time advocating for Mr. Kamalmaz's release and publicizing his plight. Their efforts resulted in numerous tips and leads about Mr. Kamalmaz's whereabouts.

41. The Kamalmaz Family endured great emotional distress, and each new lead brought fear and pain, and false hope.

42. The Kamalmaz Family and its support network obtained information from a Syrian prison guard regarding Mr. Kamalmaz. At one point, the guard reported that Mr. Kamalmaz would be released within a few days. That never occurred.

43. At one point, the Czech Republic asked Syrian officials about Mr. Kamalmaz's release. Syrian officials confirmed they were holding Mr. Kamalmaz, and the then-Czech Ambassador to Syria also later confirmed that Mr. Kamalmaz was imprisoned.

44. In April or May 2017, a man recently released from a Syrian prison provided the Kamalmaz Family with a direct message from Mr. Kamalmaz saying that he was alive and imprisoned by the Syrian regime.

45. In late-2017, a person with direct access to the Syrian military informed the Kamalmaz Family that Mr. Kamalmaz was being held and was alive but that the Syrian regime was refusing to release him.

46. Multiple reports in 2017 through 2018 said that Mr. Kamalmaz had "red lines" under his name in the Syrian regime's prison system records, meaning that he was a high-profile detainee whose fate was controlled by the highest levels of the Syrian regime.

47. The Kamalmaz Family also received reports that Mr. Kamalmaz was at times held in other prisons, including a Syrian Intelligence facility in Damascus called Branch 285 and Sednaya Prison (a/k/a Saydnaya Prison).

48. These prisons are also infamous for inhuman treatment, torture, and killings. *See Trial of Anwar Raslan and Eyad Al Gharib* at 487, Syria Justice and Accountability Centre, https://syriaaccountability.org/content/files/2023/03/CUMULATIVE-ENGLISH-REPORTS.s-2.pdf (last visited July 12, 2024) (fifty-five-year-old former employee of the Syrian General Intelligence Directorate testifying that his own cousin was tortured and killed at Branch 285); *id.*

(testifying that he see trucks carrying corpses out of Branch 285); Amnesty International, *About Saydnaya*, https://saydnaya.amnesty.org/en/saydnaya.html (last visited July 12, 2024) (noting Saydnaya is "notorious for the use of torture and excessive force").

49. Regardless of the Syrian prison, the U.S.-based Syrian Network for Human Rights has explained that: "[T]here is hardly any male or female detainee who has not been subjected to some form of torture which is practiced from the very first moments of detention." *See* Syrian Network for Human Rights, *Documentation of 72 Torture Methods the Syrian Regime Continues to Practice in Its Detention Centers and Military Hospitals* (Oct. 21, 2019), https://bit.ly/3boPpxb.

50. The Kamalmaz Family spent years in this cycle—they would receive a report that Mr. Kamalmaz was alive and being held in horrific conditions; they would do everything in their power to run down the report and obtain his release; and then they would have to deal with the emotional letdown of the lead turning out to lead nowhere.

51. Throughout all of this, the Kamalmaz Family maintained hope that Mr. Kamalmaz would be released alive by the Syrian regime. They put their lives on hold; devoted countless hours advocating for his release; spent money traveling to meeting-after-meeting; and, of course, dealt with the extreme emotional toll of Mr. Kamalmaz's detention.

52. In January 2020, the FBI traveled to Texas to meet with several members of the Kamalmaz Family. There, the Kamalmaz Family was given permission to view a Syrian document that stated Mr. Kamalmaz had died in Syrian custody. The family believed that this was a false and a self-serving document prepared by the murderous regime to cover its tracks and end further inquiry.

53. Mr. Kamalmaz was healthy and had climbed Mount Kilimanjaro in Tanzania with his son, Plaintiff Ibrahim Kamalmaz, just months before his abduction. He died because he was kept in inhuman conditions and tortured.

54. In May 2024, members of the Kamalmaz Family met with U.S. officials in Washington, D.C., where they were advised that the U.S. government was highly confident that Syria had killed Mr. Kamalmaz and invited the family to seek a death certificate.

55. Mr. Kamalmaz suffered grievously and died at the hands of the Syrian regime. The Kamalmaz Family has likewise suffered immensely as a result of the Syrian regime's unconscionable actions. They deserve vindication.

## PLAINTIFFS' CLAIMS FOR RELIEF

### COUNT I

### (Extrajudicial Killing Under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c))

56. Plaintiffs re-allege and incorporate by reference the foregoing allegations as if fully set forth herein.

57. The killing of Majd Kamalmaz constituted an extrajudicial killing in violation of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(c).

58. At all relevant times, Syria has been designated by the United States as a state sponsor of terrorism.

59. Syrian officials and agents purposefully killed Mr. Kamalmaz. Acting in concert and with premeditation, these officials and agents deliberately killed Mr. Kamalmaz and attempted to cover up his death.

60. At all relevant times, the Syrian officials and agents described above acted within the scope of their office, employment, or agency, and at the behest and under the operational control of the government of Syria.

61. The killing of Mr. Kamalmaz was not authorized by any judgment pronounced by a regularly constituted court affording judicial guarantees.  Moreover, Mr. Kamalmaz was an unarmed non-combatant and did not pose a real or apparent threat to persons or property that would have justified the use of deadly force.

62. Mr. Kamalmaz's killing violated Syria's obligations under Article 3 of the Fourth Geneva Convention of August 12, 1949, relative to the Protection of Civilian Persons in Time of War.  Geneva Convention Relative to the Treatment of Prisoners of War art. 3, Aug. 12, 1949, [1955] 6 U.S.T. 3316, T.I.A.S. No. 3364.  Article 3, which reflects customary international law, prohibits the murder of persons taking no active part in hostilities during internal armed conflicts.  Such murder is also a war crime under customary international law.  *Id.*

63. Finally, the Syrian regime's deliberate killing of Mr. Kamalmaz, without justification or even a semblance of judicial process, constitutes an arbitrary deprivation of the right to life, in breach of Article 6(1) of the International Covenant on Civil and Political Rights, to which Syria is a party.

64. Syria is liable for the wrongful acts of its officials, employees, and agents, which directly and proximately caused the extrajudicial killing of Mr. Kamalmaz and the wrongful death and personal injuries alleged herein.

## **Entitlement to Recovery Under § 1605A**

### *Wrongful Death*

65. Under 28 U.S.C. § 1605A(c), Plaintiffs Hassnaa Kamalmaz, Maryam Kamalmaz, Ula Kamalmaz, Khalid Kamalmaz, Ibrahim Kamalmaz, and Samar Hamwi, as heirs-at-law and beneficiaries of the Estate of Majd Kamalmaz, are entitled to recover compensatory damages from Syria for economic losses resulting from the premature death of Mr. Kamalmaz, including lost anticipated earnings. The amount of these compensatory damages shall be determined at trial.

### *Intentional Infliction of Emotional Distress and Solatium*

66. Defendant Syria, through its officials, employees, and agents, engaged in extreme and outrageous conduct by kidnapping and murdering Majd Kamalmaz.

67. Defendant Syria thereby intentionally and recklessly caused severe emotional distress to Mr. Kamalmaz's immediate family members, including his wife Hassnaa Kamalmaz, and his children Maryam Kamalmaz, Ula Kamalmaz, Khalid Kamalmaz, Ibrahim Kamalmaz, and sister, Samar Hamwi.

68. The Syrian regime's killing of Mr. Kamalmaz was designed to intimidate and terrorize the civilian population of Syria, the victims' loved ones, and the international community. The death of Mr. Kamalmaz caused the members of the Kamalmaz family to suffer emotional pain and deprived them of the society and comfort of their father, husband, and brother with whom they had a close emotional relationship.

69. Under 28 U.S.C. § 1605A(c), Plaintiffs Hassnaa Kamalmaz, Maryam Kamalmaz, Ula Kamalmaz, Khalid Kamalmaz, Ibrahim Kamalmaz, and Samar Hamwi, in their individual capacities, are entitled to recover compensatory damages for personal injury and solatium in an amount to be determined at trial.

*Punitive Damages*

70. Defendant Syria's conduct was criminal in nature, deliberate, willful, wanton, malicious, a threat to international peace and security, and in violation of fundamental norms of international law.

71. Under 28 U.S.C. § 1605A(c), an award of punitive damages should be imposed against Defendant Syria in an amount to be determined at trial.

## COUNT II

### (Personal Injuries Caused by Torture Under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c))

72. Plaintiffs re-allege and incorporate by reference the foregoing allegations as if fully set forth herein.

73. Under 28 U.S.C. § 1605A(c), the Estate of Majd Kamalmaz has a private, federal right of action against the Syrian Arab Republic for committing acts of torture against Mr. Kamalmaz. Section 1605A(c) requires four elements to be satisfied, all of which are met here:

   (a) As of December 29, 1979, the Government of the Syrian Arab Republic, has been designated a state sponsor of terrorism by the U.S. Secretary of State. *See* U.S. Dep't of State Bureau of Counterterrorism, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited July 22, 2024).

   (b) Mr. Kamalmaz was a U.S. citizen at the time of his imprisonment and torture and was therefore a national of the United States;

   (c) The statute requires at 28 U.S.C. § 1605A(a)(2)(iii) that a claimant afford the foreign state a reasonable opportunity to arbitrate the claim if the actions giving rise to the lawsuit occurred in that foreign state. Simultaneously with the filing of the pleadings and the service of the Complaint, Plaintiffs provided Syria an Offer to Arbitrate the claim; and

   (d) The foregoing allegations amount to "an act of torture . . . engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1).

74. The definition of "torture" under Section 1605A, which is derived from Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73, Section 3(b) (codified at 28 U.S.C. § 1350 (note)), includes:

> [A]ny act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

75. Defendant Syria, acting through and in concert with its agents, intentionally subjected Mr. Kamalmaz to severe pain and suffering, inhumane confinement, and physical and mental abuse. These actions constitute torture as defined under the FSIA and TVPA.

76. Defendant Syria caused Mr. Kamalmaz to suffer extreme mental and physical anguish and pain while in Syrian custody.

77. Defendant Syria is therefore liable to the Estate of Mr. Kamalmaz for the full amount of his damages, in such sum as they may be hereinafter determined.

**Entitlement to Recovery Under § 1605A**

*False Imprisonment*
*(As to the Estate of Majd Kamalmaz)*

78. Plaintiffs re-allege and incorporate by reference the foregoing allegations as if fully set forth herein.

79. Defendant Syria, acting through and in concert with its agents deprived Mr. Kamalmaz of liberty without cause and without legal justification. Defendant held Mr. Kamalmaz in detention even though there was no basis to do so. Mr. Kamalmaz was notably never charged with a crime under Syrian law despite being held against his will.

80. The officials, agents and employees of Syria, acting within the scope of their office, employment, or agency, caused Mr. Kamalmaz to suffer extreme mental and physical pain.

81. Defendant Syria is therefore liable to Mr. Kamalmaz for the full amount of his damages, in such sum as they may be hereinafter determined.

### *Assault and Battery*
### *(As to the Estate of Majd Kamalmaz)*

82. Plaintiffs re-allege and incorporate by reference the foregoing allegations as if fully set forth herein.

83. Defendant Syria physically assaulted Mr. Kamalmaz and took actions intended to make Mr. Kamalmaz believe he would be physically harmed. Syria also intended harmful or offensive contact with Mr. Kamalmaz without his consent.

84. As described in the foregoing allegations, the officials, agents and employees of Syria, acting within the scope of their office, employment, or agency, caused Mr. Kamalmaz to suffer extreme mental and physical anguish and pain.

85. Defendant Syria is therefore liable to the Estate of Mr. Kamalmaz for the full amount of his damages, in such sum as they may be hereinafter determined.

### *Intentional Infliction of Emotional Distress*
### *(As to the Estate of Majd Kamalmaz)*

86. Plaintiffs re-allege and incorporate by reference the foregoing allegations as if fully set forth herein.

87. Defendant Syria's imprisonment and torture of Mr. Kamalmaz violated acceptable norms of treatment under both U.S. and international law and was intentional, reckless, extreme and outrageous. Syria threatened Mr. Kamalmaz with bodily harm, physically abused him, and subjected him to inhumane living conditions and psychological trauma.

88. As described in the foregoing allegations, the officials, agents and employees of Syria acting within the scope of their office, employment, or agency, caused Mr. Kamalmaz to suffer extreme mental and physical anguish and pain.

89. Defendant Syria is therefore liable to the Estate of Mr. Kamalmaz for the full amount of his damages, in such sum as they may be hereinafter determined.

*Intentional Infliction of Emotional Distress and Solatium*
*(As to Hassnaa Kamalmaz, Maryam Kamalmaz, Ula Kamalmaz,*
*Khalid Kamalmaz, Ibrahim Kamalmaz, and Samar Hamwi)*

90. Defendant Syria also intentionally and recklessly caused severe emotional distress to Mr. Kamalmaz's immediate family members, including his wife Hassnaa Kamalmaz, and his children Maryam Kamalmaz, Ula Kamalmaz, Khalid Kamalmaz, Ibrahim Kamalmaz, and his sister, Samar Hamwi.

91. The Syrian regime's treatment of Mr. Kamalmaz was designed to intimidate and terrorize the civilian population of Syria, the victims' loved ones, and the international community. Mr. Kamalmaz's treatment caused the members of the Kamalmaz family, with whom they had a close emotional relationship, to suffer emotional pain.

92. Under 28 U.S.C. § 1605A(c), Plaintiffs Hassnaa Kamalmaz, Maryam Kamalmaz, Ula Kamalmaz, Khalid Kamalmaz, Ibrahim Kamalmaz, and Samar Hamwi, in their individual capacities, are entitled to recover compensatory damages for personal injury and solatium in an amount to be determined at trial.

*Punitive Damages*

93. Defendant Syria's conduct was criminal in nature, deliberate, willful, wanton, malicious, and in violation of fundamental norms of international law protecting human rights and civilians in conflict.

94. Under 28 U.S.C. § 1605A(c), an award of punitive damages should be imposed against Defendant Syria in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment against Defendant the Syrian Arab Republic in favor of Plaintiffs for compensatory damages, including for economic damages, solatium, pain and suffering, and punitive damages, in an amount not less than $70 million.

B. Award reasonable attorney's fees and costs, including expert fees and interest.

C. Provide any other further relief the Court deems just and proper.


Dated: July 22, 2024                                    Respectfully submitted,

                                                                  /s/ *Kirby D. Behre*
Kirby D. Behre (D.C. Bar #398461)
Cody F. Marden (D.C. Bar #1631944)
Miller & Chevalier Chartered
900 16th Street, NW
Washington, D.C. 20006
Tel:   (202) 626-5800
Fax:   (202) 626-5801
Email: kbehre@milchev.com
Email: cmarden@milchev.com